1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

UNITED STATES OF AMERICA,       )
                                )
                    Plaintiff,  )     Case No.  2:13-cr-00304-JCM-CWH
                                )
vs.                             )     **REPORT & RECOMMENDATION**
                                )
CHAD LOFTIN,                    )
                                )
                    Defendant.  )
_____ )

This matter was referred to the undersigned Magistrate Judge on Defendant's Motion to Suppress Evidence for Fourth Amendment Violation (#26), filed October 28, 2013; the Government's Response (#28), filed November 13, 2013; and Defendant's Reply (#29), filed November 19, 2013.  An evidentiary hearing was conducted on January 8, 2014.  At the conclusion of the evidentiary hearing, the parties requested additional time to meet and confer to determine if additional briefing or hearing would be necessary.  On January 15, 2014, the parties filed a joint status report requesting additional time in order to meet and confer to determine whether additional information would be submitted regarding certain reports utilized during the evidentiary hearing. (#38).  The request for additional time was granted.  (#39).  Thereafter, on January 23, 2014, the parties submitted a joint status report indicating that further briefing and hearing was not necessary. (#40).

## I.  BACKGROUND

On August 6, 2013, the Grand Jury returned an Indictment charging Defendant Chad Loftin ("Loftin") with being a felon unlawfully in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  (#1).  The indictment stems from a police encounter that occurred on the

1   evening of July 5, 2013.  Prior to that date, on July 3, 2013, Las Vegas Metropolitan Police

2   Detectives Leaman and McMurtry were conducting an investigation at 2817 West Sahara,

3   Apartment #5 in Las Vegas, Nevada.  The investigation involved allegedly stolen property,

4   including a coffee machine and a flat screen television from the MGM Grand Hotel.  With the

5   cooperation of a tenant, the detectives searched the apartment and seized various items, including a

6   digital scale and suspected drugs, equipment allegedly used for forgery, and a firearm with a serial

7   number that had been removed.  After seizing the property, the detectives intercepted a telephone

8   conversation from an inmate at Clark County Detention Center identified as Anthony Lisi, whose

9   registered address was the same address from which the allegedly stolen items were seized.  During

10  the intercepted conversation, Lisi allegedly stated to his wife, who was the cooperating tenant in the

11  July 3rd apartment search, to "take care of that stuff behind the couch" because "if the cops find it

12  I'm looking at a long time."

13        Thereafter, on July 5, 2013 at approximately 10 p.m., the same detectives involved in the

14  July 3rd apartment search returned to follow up on the information obtained from the intercepted

15  telephone call.[1]  The detectives were in plain clothes and arrived in separate, unmarked vehicles.

16  The vehicles were parked in the vicinity of the apartment previously searched on July 3rd.  Though

17  in plain clothes, the detectives badges were displayed and they were wearing dark colored vests

18  identifying them as police officers.[2]  The detectives were armed, and Detective Leaman's weapon

19  was visible.  The door to the apartment was open, with an adult female and one or two children

20  visible.

21  ────────────

22  [1] In addition to Detectives Leaman and McMurtry, Las Vegas Metropolitan Police Detectives Nakhla and Kinsler were also present at the apartment complex.

23

24  [2] Detective Leaman indicated on cross examination that although he did not recall doing so, it is possible he may have communicated with his fellow detectives and dispatch via text message prior to their arrival.  Defense counsel made an oral motion pursuant to Fed. R. Crim. P. 26.2 requesting the production of all text messages sent by Detective Leaman on July 5, 2013 related to the incident.  The request was denied without prejudice and defense counsel invited to file a discovery motion if the material was desired for trial or to reopen the evidentiary hearing.  It was partly for this purpose that the hearing was held open so that the parties could meet and confer.  *See* (#38) and (#40).  Defendant has not filed a discovery motion and, based on the joint status reports submitted after the hearing, it does not appear the text messages exist or are necessary to aid in the decision of this motion.

2

Shortly after arrival at the apartment, Detective Leaman observed a man, later identified as Defendant Loftin, park a vehicle in a space near the door to the apartment.   Loftin got out of the vehicle carrying several plastic grocery bags and a sweatshirt.  He was wearing jeans and a t-shirt. Loftin walked towards the apartment where Detective Leaman was standing.  Detective Leaman testified that did not recognize or otherwise know Loftin.  As Loftin approached the apartment door, Detective Leaman inquired as to whether he was going to the apartment.  Loftin answered in the affirmative and stated that he had food for the occupants.  Detective Leaman asked Loftin if he had identification, to which Loftin responded in the affirmative.  At that time, Loftin leaned down to place the plastic grocery bags he was carrying on the ground.  Detective Leaman testified that Loftin nervously inquired what was going on.  He further testified that Loftin leaned down for about 10 to 12 seconds to place the grocery bags on the ground.  As he did so, Detective Leaman testified that Loftin appeared to be adjusting his pants on the lower right leg.  In addition to the lighting in the area not being very bright, Detective Leaman testified that the grocery bags and sweatshirt held by Loftin prevented a clear view of what Loftin was doing with his lower right leg. Detective Leaman testified that he found Loftin's behavior suspicious and was immediately concerned for his safety.  Consequently, he commanded Loftin to "[l]et me [Detective Lehman] see your hands."

During this time, Detective McMurtry had walked up from behind Loftin.  Detective McMurtry testified that he also noticed Loftin took approximately 10 seconds to put the grocery bags on the ground, which seemed much longer than was necessary.  Detective McMurtry also testified that Loftin was adjusting his pants on the lower right leg and appeared to be stalling. Seeing this, it was Detective McMurtry who asked Loftin whether he had any weapons.  Loftin denied having any weapons, to which Detective McMurtry asked: "Can I check?"  Loftin allegedly responded:  "Go ahead."  To accomplish the search, Detective McMurtry told Loftin to place his hands behind his back.  Loftin complied.  While holding Loftin's hands behind his back, Detective McMurtry told him to spread his legs for purposes of the search.  Detective Leaman testified that when Loftin spread his legs, he saw the butt of a pistol near Loftin's feet.  Both officers testified that they also heard a metallic "thud" sound, which turned out to be a firearm hitting the ground

3

where Loftin was standing and near his right leg. Detective McMurtry immediately tightened his hold on Loftin, pushed him toward a nearby wall (away from the pistol), and handcuffed him. The detectives later learned that Loftin was a convicted felon and arrested him for illegal possession of a firearm.

Mr. Wesley Ranson ("Ranson"), a security guard at the apartment complex, testified that while he was duty near the apartment he came upon the scene where Detective Leaman and McMurtry were interacting with Loftin. Ranson testified that from his vantage point about 20 feet away, he saw Loftin facing towards him with his hands behind his back. One officer was standing behind Loftin, and one officer beside him. Ranson testified that he believed Loftin was handcuffed at that time, and a detective was holding onto Loftin's hands or cuffs as he searched Loftin. Ranson also heard the metallic "thud" when Loftin was ordered to spread his legs. He testified that a detective then picked up the firearm while Loftin stated that the gun was not his. Ranson did not recall seeing handcuffs being placed on Loftin after the gun was discovered. He believed the handcuffs were on Loftin before the search was conducted. On cross examination, Ranson agreed that he did not see the handcuffs, could not hear any of the other conversation, and did not see where the firearm came from. Ranson testified that the entire sequence of events he witnessed took about 8 to 10 minutes

By way of this motion, Loftin contends that the detectives lacked any reasonable suspicion to stop or search him. They ask that all evidence seized as a result of the encounter, specifically the firearm, be suppressed as fruits of an illegal search.[3]

---

[3] Detective Ramon Nakhla also testified at the evidentiary hearing. He testified that he arrived at the complex at approximately the same time as the other detectives, and was was about 100 feet from the scene interviewing Ms. Lisi. He testified that he did not witness the search or arrest of Defendant Loftin. The Court, therefore, did not consider his testimony.

Defense exhibits B and E were introduced as evidence through Detective Leaman. The exhibits contain entries indicating that Loftin may have been the subject of a traffic stop or other contact with the police prior to the events currently under consideration. At the request of counsel, because of the late disclosure of this evidence to the defense, the court held the hearing open to allow the investigation of these entries, and to determine whether additional information should be considered. Ultimately, the parties did not submit any additional information. (#38) and (#40).

## II.  ANALYSIS

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. Amend. IV.  It protects reasonable and legitimate expectations of privacy and has long been held to protect "people not places." *See Katz v. United States*, 389 U.S. 347 (1967).  Evidence obtained in violation of the Fourth Amendment must generally be suppressed.  *See Wong Sun v. United States*, 371 U.S. 471 (1963).  Loftin's motion to suppress is premised on the argument that (1) there was no reasonable suspicion to justify the initial stop, (2) he did not consent to the search of his person, and (3) there was no basis to search him without a warrant.  The Government counters that Loftin consented to the search or, alternatively, that the initial stop and subsequent frisk were justified under *Terry v. Ohio*, 392 U.S. 1 (1968).

It is axiomatic that law enforcement does not run afoul of the Fourth Amendment every time they stop an individual.  The Supreme Court has long held that police may stop a citizen at any time, ask for identification and other information, and even request permission to search so long as a reasonable person in the citizen's position would recognize that he or she is free to leave or terminate the encounter.  *See generally Terry*, 392 U.S. 1 (1968); *see also Florida v. Royer*, 460 U.S. 491 (1983); *Florida v. Rodriguez*, 469 U.S. 1(1984).  Indeed, police officers can approach individuals as to whom they have no reasonable suspicion and ask them potentially incriminating questions because "mere police questioning does not constitute a seizure." *Florida v. Bostick*, 501 U.S. 429, 437 (1991).  The initial inquiry into where Loftin was going and whether he had identification as he approached the apartment door was not inappropriate or otherwise illegal.  There is no indication in the record that Loftin was not free to leave or terminate the encounter.  Nor would a reasonable person in his position believe otherwise.  Loftin did not end the encounter.  He answered Detective Lehman's question and, in response to the request to provide identification, stooped down to place the items in his hands on the ground so that he could retrieve his identification.

At some point, the encounter transformed into something more than a consensual one.  The precise point at which this transformation occurs is not always clear, but the Supreme Court has identified it as the moment when "a reasonable person would . . . believe [ ] that he [is] not free to leave" as determined under a totality of the circumstances.  *I.N.S. v. Delgado*, 466 U.S. 210, 215 (1984) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).  Here, as Loftin was stooping down to drop the items in his hands and retrieve his identification both Detective Lehman and Detective McMurtry testified that he began to adjust or alter his pants near the bottom of his right leg.  This action raised suspicion for both detectives.  Further, both detectives testified that Loftin took an inordinately long amount of time to put the items in hands down and that he seemed to be stalling.  As a result, Detective McMurtry asked Loftin whether he had any weapons, to which Loftin responded that he did not.  Based on the circumstances, at the point Detective McMurtry asked whether Loftin had weapons, a reasonable person would not believe he was free to leave and continued detention needed to be supported by, at minimum, reasonable suspicion.

## A. **Investigatory Detention**

An investigatory detention under the Fourth Amendment must be supported by "reasonable suspicion" that criminal activity may be afoot.  *See Terry v. Ohio*, 392 U.S. 1 (1968); *United States v. Arvizu*, 534 U.S. 266, 273 (2002).  Reasonable suspicion is determined by looking at the totality of the circumstances and must be supported by "specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detain is engage in criminal activity."  *United Sates v. Thompson*, 282 F.3d 673, 678 (9th Cir. 2002) (citing *United States v. Rojas-Millan*, 234 F.3d 464, 468-69 (9th Cir. 2000).  An officer is entitled to rely on his training and experience in drawing inferences from the facts he observes, but those inferences must also "be grounded in objective facts and capable of rationale explanation."  *United States v. Mariscal*, 285 F.3d 1127, 1130 (9th Cir. 2002) (citing *United States v. Lopez-Soto*, 205 F.3d 1101, 1105 (9th Cir. 2000); *see also Arvizu*, 534 U.S at 273 (reasonable suspicion is a process that "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'") (citation omitted).

6

The Fourth Amendment is satisfied if an officer's action is supported by reasonable suspicion based on the observation of facts which are by themselves consistent with innocence, but may collectively amount to reasonable suspicion. *Id*. at 273-74. As the Supreme Court has said: "The process does not deal with hard certainties, but with probabilities." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). Nevertheless, reasonable suspicion requires more than a "hunch" even if the hunch later turns out to be a good one. *Terry*, 392 U.S. at 27. Importantly, even if "the conduct justifying the stop [is] ambiguous and susceptible of an innocent explanation," *Terry* permits detention so the officers can resolve the ambiguity. *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) (citing *Terry*, 392 U.S. at 30).

Here, the totality of the circumstances justified a *Terry* stop. Just two days prior, the same detectives had seized evidence from the apartment of illegal narcotics distribution, forgery, theft of property, and a firearm that had its serial number removed. Further, the detectives had intercepted a telephone call directed toward an occupant of the apartment indicating that there might, potentially, be more evidence of criminal activity in the apartment. In that telephone call, the occupant of the apartment was specifically instructed to destroy or otherwise hide evidence in order to prevent potential prosecution. Under these circumstances, it was certainly reasonable to ascertain Loftin's destination and identity as he approached the apartment.

Further, it was reasonable for the officers to expand their questioning as a consequence of Loftin spending several seconds altering or adjusting his right pant leg while retrieving his identification. Both detectives testified that it was this movement that primarily piqued their suspicion. Both testified that they were concerned for their own safety. They had knowledge of a potential weapon inside the apartment. They had knowledge of instructions to a resident of the apartment to destroy or hide potential evidence. Under these circumstances, it was not unreasonable to stop Loftin at the apartment door, prevent him from entering, and ask him additional questions. There are certainly many potentially innocent reasons why Loftin would be visiting the apartment. However, a *Terry* stop contemplates a limited detention to resolve such ambiguities. The Supreme Court has explained that a police officer need not "simply shrug his shoulders and allow a crime to occur or a criminal to escape." *Adams v. Williams*, 407 U.S. 143,

145-47 (1972) (citations omitted).  Thus, when viewed in their totality, the circumstances here justified a *Terry* stop.

## B. **Frisk for Weapons**

That conclusion does not end the analysis.  It is Loftin's position that any search, even a search under *Terry*, was not supported because there was no basis to believe that Loftin was armed and dangerous.  A stop-and-frisk under *Terry* constitutes two independent actions, each requiring separate justifications.  The stop must be based on a suspicion of criminal activity and the frisk on a reasonable suspicion that the person is armed.  *United States v. Thomas*, 863 F.2d 622, 628 (9th Cir. 1988) ("A lawful frisk does not always flow from a justified stop. Each element, the stop and the frisk, must be analyzed separately; the reasonableness of each must be independently determined."); *see also*, *United States v. Flippin*, 924 F.2d 163, 165 (9th Cir. 1991)(same).  During an investigatory detention, an officer may frisk an individual for weapons where he has reason to believe that he is dealing with an armed and dangerous individual.  *Terry*, 392 U.S. at 27.

The purpose of the limited search is to allow officers to conduct investigations without fear of violence. *See Adams v. Williams*, 407 U.S. 143, 146 ( 1972); *see also United States v. $109,179 in United States Currency*, 228 F.3d 1080, 1086 (9th Cir. 2000).  The "narrow scope" of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked.  *Ybarra v. Illinois*., 444 U.S. 85, 93-94 (1979).  Nothing in *Terry* can be understood to allow a generalized "cursory search for weapons."  In the companion case to *Terry*, the Court further developed the requirements for a frisk:

> The police officer is not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries.  Before he places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so. In the case of the self-protective search for weapons, he must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous.

*Sibron v. New York*, 392 U.S. 40, 64 (1968).  The Ninth Circuit has considered furtive movements by defendants, or repeated attempts to reach for an object that was not immediately visible, as actions that can give rise to a reasonable suspicion that a defendant is armed. *See e.g., Flippin*, 924 F.2d at 164-66 (officer alone in room with woman who grabbed a bag while he was looking away); *United States v. Taylor*, 716 F.2d 701, 709 (9th Cir. 1983) (suspect known to be involved in

8

methamphetamine manufacturing refused to raise his hands and made furtive movements inside his truck); *see also United States v. Mitchell*, 293 U.S. App. D.C. 24, 951 F.2d 1291, 1293 (D.C. Cir. 1991) (suspect moved  his hands under his coat in manner suggesting he had a gun); *United States v. Price*, 366 U.S. App. D.C. 166, 409 F.3d 436, 439 (D.C. Cir. 2005) (suspect reached back inside of car when told to place hands outside of window); *cf. Ybarra*, 444 U.S. at 93 (not finding reasonable suspicion where defendant, "whose hands were empty, gave no indication of possessing a weapon, made no gestures or other actions indicative of an intent to commit an assault, and acted generally in a manner that was not threatening.").

The central question relating to the frisk here is whether the detectives had objectively reasonable grounds to support the decision to frisk Loftin.  The standard is whether a reasonably prudent person in the circumstances would be warranted in the belief that his safety or that of others was in danger.  *Terry*, 392 U.S. at 27.  The officer must have a subjective belief that is objectively reasonable.  *United States v. Prim*, 698 F.2d 972, 975 (9th Cir. 1983); accord *United States v. Lott*, 870 F.2d 778, 783-84 (1st Cir. 1989).  Both Detectives Leaman and McMurtry testified that they became concerned for their personal safety because of the manner in which Loftin placed the grocery bags on the ground.  Both testified that it took 10 seconds – much longer than they believed objectively  necessary  –  for Loftin the place the bags on the ground.  Both noticed and were concerned that Loftin was adjusting his lower right pants as he did so.  Both testified that it was difficult to see due to lighting and the items in Loftin's hands.  The detectives had recovered a firearm from the apartment just two days prior.  The detectives were present at the apartment because they intercepted instructions to the occupant of the apartment to hide, conceal, or otherwise destroy potentially incriminating evidence located in the apartment.  There were children present in the apartment at the time of the encounter with Loftin.  Detective Leaman spontaneously signaled his safety concern when he said, "[s]how me your hands" to Loftin.   He testified that the reason for his order was because of the suspicious nature of Loftin's actions.  Based on the totality of these circumstances, the undersigned finds the police acted reasonably when they initiated the frisk of Loftin.

Having so concluded, the Court declines to the parties' arguments surrounding consent to

search.  Regardless of consent, both the stop and the frisk were justified.  The firearm sought to be suppressed was recovered at the commencement of the lawful frisk, not as a result of a Constitutional violation.

Based on the foregoing and good cause appearing therefore,

### RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence for Fourth Amendment Violation (#26) be **denied**.

### NOTICE

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days.  The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time.  *Thomas v. Arn*, 474 U.S. 140, 142 (1985).  This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court.  *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED: March 13, 2014.

_____
**C.W. Hoffman, Jr.**
**United States Magistrate Judge**

10