# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| Plaintiff, ) | Case No. 2:13-cr-00304-JCM-CWH |
| vs. ) | **REPORT & RECOMMENDATION** |
| CHAD LOFTIN, ) | |
| Defendant. ) | |

This matter was referred to the undersigned Magistrate Judge on Defendant's Motion to Suppress Evidence for Fourth Amendment Violation (#26), filed October 28, 2013; the Government's Response (#28), filed November 13, 2013; and Defendant's Reply (#29), filed November 19, 2013. An evidentiary hearing was conducted on January 8, 2014. At the conclusion of the evidentiary hearing, the parties requested additional time to meet and confer to determine if additional briefing or hearing would be necessary. On January 15, 2014, the parties requested additional time in order to meet and confer to determine whether additional information would be submitted regarding certain reports utilized during the evidentiary hearing, which was granted. (#39). Thereafter, on January 23, 2014, the parties submitted a joint status report indicating that further briefing and hearing was not necessary. (#40). The undersigned issued a Report and Recommendation on March 13, 2014, recommending that Defendant's Motion to Suppress (#26) be denied. (#44).

Shortly after issuance of the recommendation, and prior to the filing of any objections thereto, Defendant moved for the production of certain cell phone records. *See* Def.'s Mot. (#46). After multiple stipulated extensions of time to continue the trial dates, file objections to the

recommendation, and file a response to the motion for production of cell phone records, the undersigned, on June 16, 2014, held a hearing on the pending motion for production.[1] The motion for production (#46) was granted to the extent the information sought was discoverable. As a result, the Government was required to obtain certain information and pass that information to defense counsel, who was instructed to obtain a subpoena for the records.

Thereafter, on June 23, 2014, Defendant filed an objection to the still pending report and recommendation. *See* Def.'s Objection (#76). The Government filed its response on July 17, 2014 (*see* dkt. (#79)), but, before the Court could rule on the objection, Defendant filed a request to reopen the evidentiary hearing on the motion to suppress. *See* Def.'s Mot. (#90). After briefing, on November 5, 2014, the motion to reopen the evidentiary hearing was granted and the matter recommitted to the undersigned for further proceedings. *See* Order (#96). An additional evidentiary hearing was conducted on November 20, 2014. After completion of the reopened evidentiary hearing, on December 4, 2014, Defendant submitted a supplemental brief seeking the production of emails and an adverse inference. *See* (#101). The Government filed its response on December 13, 2014. (#105). On January 21, 2015, the parties submitted a stipulation for admission of additional evidence for consideration. (#107).

## BACKGROUND

On August 6, 2013, the Grand Jury returned an Indictment charging Defendant Chad Loftin ("Loftin") with being a felon unlawfully in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (#1). The indictment stems from a police encounter that occurred on the evening of July 5, 2013. Prior to that date, on July 3, 2013, Las Vegas Metropolitan Police Detectives Leaman and McMurtry were conducting an investigation at 2817 West Sahara, Apartment #5 in Las Vegas, Nevada. The investigation involved allegedly stolen property, including a coffee machine and a flat screen television from the MGM Grand Hotel. With the cooperation of a tenant, the detectives searched the apartment and seized various items, including a

---

[1] On April 10, 2014, prior to the hearing on the motion for production, the Court granted the motion for non-opposition. (#56). That order, however, was subsequently vacated. (#57).

digital scale, suspected drugs, equipment allegedly used for forgery, and a firearm with a serial number that had been removed. After seizing the property, the detectives intercepted a telephone conversation from an inmate at Clark County Detention Center identified as Anthony Lisi ("Lisi"), whose registered address was the same address from which the allegedly stolen items were seized. During the intercepted conversation, Lisi allegedly stated to his wife, who was the cooperating tenant in the July 3rd apartment search, to "take care of that stuff behind the couch" because "if the cops find it I'm looking at a long time."

Thereafter, on the evening of July 5, 2013, the same detectives involved in the July 3rd apartment search returned to the apartment to follow up on the information obtained from the intercepted telephone call.[2] The detectives were in plain clothes and arrived in separate, unmarked vehicles.[3] Their vehicles were parked in the vicinity of the previously searched apartment. Though in plain clothes, the detectives badges were displayed and they were wearing dark colored vests identifying them as police officers. The detectives were armed. Detective Leaman's weapon was visible. The door to the apartment was open, and an adult female and one or two children were visible.

Shortly after arrival at the apartment, Detective Leaman observed a man, later identified as Defendant Loftin, park a vehicle in a space near the door to the apartment. Loftin exited the vehicle carrying several plastic grocery bags and a sweatshirt. He was wearing jeans and a t-shirt. Loftin walked towards the apartment where Detective Leaman was standing. Detective Leaman testified that did not recognize or otherwise know Loftin. As Loftin approached the apartment

---

[2] In addition to Detectives Leaman and McMurtry, Las Vegas Metropolitan Police Detectives Nakhla and Kinsler were also present at the apartment complex.

[3] Detective Leaman indicated on cross examination that although he did not recall doing so, it is possible he may have communicated with his fellow detectives and dispatch via text message on his personal phone prior to their arrival. Defense counsel made an oral motion pursuant to Fed. R. Crim. P. 26.2 requesting the production of all text messages sent by Detective Leaman on July 5, 2013 related to the incident. The request was denied without prejudice and defense counsel invited to file a discovery motion if the material was desired for trial or to reopen the evidentiary hearing. It was partly for this purpose that the hearing was held open so that the parties could meet and confer. *See* (#38) and (#40). Defendant's subsequent motion for production of the cell phone records (#46) was granted, but no text records were available from the carrier.

door, Detective Leaman inquired as to whether he was going to the apartment. Loftin answered in the affirmative, stating he had food for the occupants.

As Loftin approached the apartment, Detective Leaman asked him if he had identification. Loftin responded in the affirmative and leaned down to place the grocery bags he was carrying on the ground. Detective Leaman testified that Loftin nervously inquired what was going on. He further testified that Loftin leaned down for about 10 to 12 seconds to place the grocery bags on the ground, and that Loftin appeared to be adjusting his pants on the lower right leg. Detective Leaman testified that, in addition to the lighting in the area not being very bright, the grocery bags and sweatshirt held by Loftin prevented a clear view of what Loftin was doing with his lower right leg. Detective Leaman testified that he found Loftin's behavior suspicious and was immediately concerned for his safety. Consequently, he commanded Loftin to "[l]et me [Detective Lehman] see your hands."

During this time, Detective McMurtry had walked up from behind Loftin. Detective McMurtry testified that he also noticed Loftin took several seconds to put the grocery bags on the ground, which seemed much longer than was necessary. Detective McMurtry also testified that Loftin appeared to be adjusting his pants on the lower right leg and stalling. Seeing this, it was Detective McMurtry asked Loftin whether he had any weapons. Loftin denied having any weapons, to which Detective McMurtry asked: "Can I check?" Loftin allegedly responded: "Go ahead." To accomplish the search, Detective McMurtry told Loftin to place his hands behind his back. Loftin complied. While holding Loftin's hands behind his back, Detective McMurtry told him to spread his legs. Detective Leaman testified that when Loftin spread his legs, he saw the butt of a pistol near Loftin's feet. Both officers testified that they heard a metallic "thud" sound, which they believed was the firearm hitting the ground near Loftin's right leg. Detective McMurtry immediately tightened his hold on Loftin, pushed him toward a nearby wall (away from the firearm), and handcuffed him. The detectives later learned that Loftin was a convicted felon and

arrested him for illegal possession of a firearm.[4]

Mr. Wesley Ranson ("Ranson"), a security guard at the apartment complex, testified that while he was on duty near the apartment he came upon the scene. Ranson testified that from his vantage point, approximately 20 feet away, he saw Loftin facing towards him with his hands behind his back and an officer behind and beside him. Ranson testified that he believed Loftin was handcuffed at that time, and a detective was holding onto Loftin's hands or cuffs as he searched Loftin. Ranson also testified on direct examination that he heard the metallic "thud" when Loftin was ordered to spread his legs, and that a detective picked up the firearm while Loftin stated that it was not his. Ranson did not recall seeing handcuffs being placed on Loftin after the firearm was discovered, but testified that he believed Loftin was handcuffed prior to discovery of the firearm. His belief, therefore, that the handcuffs were placed on Loftin before the search was conducted is unsubstantiated. Further, on cross examination, Ranson agreed that he did not see the handcuffs, could not hear any of the other conversation, and did not see where the firearm came from.

Ranson's testimony differs from the testimony of Detectives Leaman and McMurtry in one material respect; Ranson believed that Loftin was in handcuffs prior to the search that resulted in the discovery of the firearm. In contrast, Detectives Leaman and McMurtry testified that Loftin was only handcuffed after the firearm was discovered. The undersigned carefully observed and evaluated each testifying witness and finds the testimony offered by Detectives Leaman and McMurtry regarding the description of events credible. On cross-examination, Ranson, a convicted felon on supervised release, conceded that he could not actually see handcuffs on Loftin prior to the search because Loftin was facing towards him (Ranson) with his hands behind his back. Detective McMurtry testified that he conducted the search from behind Loftin, consistent with Ranson's recollection that there was an officer behind Loftin, while holding Loftin's hands behind his back. Both detectives testified that it was only upon discovery of the firearm that Loftin was handcuffed. Thus, the Court does not view the testimony as conflicting, as Ranson concedes that he never saw

---

[4] Detective Ramon Nakhla also testified at the first evidentiary hearing that he arrived at the apartment complex at approximately the same time as the other detectives, but was about 100 feet from the scene interviewing Ms. Lisi and did not witness the search and arrest of Defendant Loftin.

handcuffs on Loftin prior to the discovery of the firearm.

At the second evidentiary hearing, Loftin called Maria Jennings, a support staff employee at Las Vegas Metropolitan Police Department ("Metro"), to testify. She testified that, on July 5, 2013, one of her duties in the Metro call center was to answer phone calls and provide assistance to officers in the field; for example, to provide information about a suspect's criminal history. She testified that when an officer calls in, she verifies the officer's identity and does what she can to assist the officer. She testified that Metro's Audit Trail Transaction List Report indicates that she conducted a police records check on Loftin at 21:44:25 hours (approximately 9:44 p.m.). She indicated that the entry would have been generated when she actually entered the inquiry about Loftin's criminal history into the system. She did not recall which officer made the request. A second entry was made for the same information at 22:37:24 (approximately 10:37 p.m.) on the same date by Officer Kinsler, one of the four detectives who involved in the investigation at the apartment.

Detective Leaman was also recalled as a witness. He testified that the passage of time from when Loftin appeared at the apartment until he was detained was approximately 5 minutes. He testified that a call would have been made to Metro's Dispatch for police records after Loftin was detained to inquire into his criminal history. Detective Leaman did not recall who made the call, but based upon the Metro Audit Trail Transaction List Report, he agreed that the call occurred at about 21:44 (9:44 p.m.). He testified that within a few minutes after arresting Loftin, he transported him to the Clark County Detention Center ("CCDC"). He estimated that it took about 25 minutes to drive from the apartment to CCDC. Detective Leaman was shown Metro's Incident Recall Report, which indicated that he and Loftin arrived at CCDC at 22:13:34 (10:13 p.m.). He testified that procedures require the arrival of a detainee at CCDC to be reported to dispatch. He testified that the process he follows is that after he and the detainee arrive at CCDC, they enter CCDC and custody is turned over to officers at CCDC, at which point the arresting officer retrieves the handcuffs. He estimated that he must have arrived at the CCDC a few minutes prior to the

arrival call which was made at 22:13:34 (10:34 p.m.).[5]

Detective Leaman testified at the first hearing that based upon his police report of the incident, he arrived at the apartments at about 10 p.m. The evidentiary hearing was reopened in large part to permit defense counsel to try to prove that Detective Leaman lied in his original testimony as to the time of arrival. The basis to reopen the evidentiary hearing was that through his personal cell phone records obtained after the first hearing, defense counsel learned that Detective Leaman called Metro dispatch about one minute prior to the 9:44 p.m. entry made when Maria Jennings obtained Loftin's criminal history. At the second hearing, Detective Leaman testified that he did not call in his location at the apartment immediately when he arrived because at that time, he did not know whether the "knock and talk" at the apartment that he had planned as a follow up to the prior visit on July 3 would result in anything that might be reportable. Thus, there was no reason to make a record of his arrival. He testified repeatedly that he had never had any contact with Loftin before the incident. Based on all of the evidence, it appears Detective Leaman must have arrived at the apartment near 9:35 p.m., confronted Loftin upon his arrival, and then called dispatch for his criminal history at about 9:44.

The Court finds that based upon the evidence presented, Detective Leaman and the other detectives did not arrive at about 10 p.m. as they previously testified, but must have arrived earlier at about 9:35 p.m. In his supplemental brief, Loftin argues that "without the benefit of Detective Leaman's explanation of this evidence, counsel is unable to pinpoint for the court exactly how this new information will effect the Report and Recommendation." See #90, pp 5-6. Although Detective Leaman's arrival time at the apartment has been successfully contradicted, defense counsel offers no theory as to what impact the 25 minute difference has on the analysis of the search, except to argue that it reflects poorly on the credibility of Detective Leaman. The Court has considered the discrepancy in evaluating Detective Leaman's credibility, but finds his testimony

---

[5] Leaman testified that based upon the records, Officer Nakhla made this call and had transported another suspect in the case at the same time. Office Leaman observed that it is Metro policy to have officers simultaneously travel when transporting prisoners because a second, "chase" car is required. Officer Nahkla had previously testified that he had transported another suspect in the case at the same time.

credible regarding his description of the search, which is the issue before this court.  This new information has no effect on the undersigned's view of the evidence regarding whether Loftin's Fourth Amendment rights were violated.[6]

## II.  ANALYSIS

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. Amend. IV.  It protects reasonable and legitimate expectations of privacy and has long been held to protect "people not places." *See Katz v. United States*, 389 U.S. 347 (1967).  Generally, evidence obtained in violation of the Fourth Amendment must be suppressed.  *See Wong Sun v. United States*, 371 U.S. 471 (1963).  Loftin's motion to suppress is premised on the argument that (1) there was no reasonable suspicion to justify the initial stop, (2) he did not consent to the search of his person, and (3) there was no basis to search him without a warrant.  The Government counters that Loftin consented to the search or, alternatively, that the initial stop and subsequent frisk were justified under *Terry v. Ohio*, 392 U.S. 1 (1968).

It is axiomatic that law enforcement does not run afoul of the Fourth Amendment every time they stop an individual.  The Supreme Court has long held that police may stop a citizen at any time, ask for identification or other identifying information, and even request permission to search so long as a reasonable person in the citizen's position would recognize that he or she is free to leave or terminate the encounter.  *See generally Terry*, 392 U.S. 1 (1968); *see also Florida v. Royer*, 460 U.S. 491 (1983); *Florida v. Rodriguez*, 469 U.S. 1(1984).  Indeed, police officers can approach individuals as to whom they have no reasonable suspicion and ask them potentially

---

[6] At the second evidentiary hearing, defense counsel proffered a document to prove that at 9:28 p.m., Loftin purchased items using an EBT card at a grocery store located at 3864 West Sahara Avenue, Las Vegas, about nine-tenths of a mile from the apartments.  Initially Government counsel objected to the evidence for various reasons.  The parties were given the opportunity to meet and confer and subsequently agreed regarding admission of the evidence.  The undersigned has reviewed the evidence and finds that it does not impact the analysis.  Assuming Loftin made the purchase as represented, he could easily have driven to the apartments in a few minutes.  The apparent grocery purchase does not adversely impact or seriously call into question Loftin's approximate 9:35 p.m. arrival at the apartment, which is consistent with Detective Leaman's explanation of the timeline.

incriminating questions because "mere police questioning does not constitute a seizure." *Florida v. Bostick*, 501 U.S. 429, 437 (1991).

Detective Leaman's initial inquiry into where Loftin was going and whether he had identification as he approached the apartment door was not inappropriate or otherwise illegal. There is no indication in the record that Loftin was not free to leave or terminate the encounter. Nor would a reasonable person in his position believe otherwise. Loftin did not end the encounter. He answered Detective Lehman's question and, in response to the request to provide identification, stooped down to place the items in his hands on the ground so that, presumably, he could retrieve his identification. At some point, however, the encounter transformed into something more than a simple discussion with police.

The precise point at which this transformation occurs is not always clear, but the Supreme Court has identified it as the moment when "a reasonable person would . . . believe [ ] that he [is] not free to leave" as determined under a totality of the circumstances. *I.N.S. v. Delgado*, 466 U.S. 210, 215 (1984) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). Here, as Loftin was stooping down to place the items in his hands on the ground and retrieve his identification, both Detective Lehman and Detective McMurtry testified that he began to adjust or alter his pants near the bottom of his right leg. This action raised suspicion for both detectives. Both detectives testified that Loftin took an unusually long time to put the items in his hands down. Both believed that he appeared to be stalling. As a result, Detective McMurtry asked Loftin whether he had any weapons, to which Loftin responded that he did not. Based on the circumstances, at the point Detective McMurtry asked whether Loftin had weapons, a reasonable person would not believe he was free to leave and continued detention needed to be supported by, at minimum, reasonable suspicion.

**A. Investigatory Detention**

An investigatory detention under the Fourth Amendment must be supported by "reasonable suspicion" that criminal activity may be afoot. *See Terry v. Ohio*, 392 U.S. 1 (1968); *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Reasonable suspicion is determined by looking at the totality of the circumstances and must be supported by "specific, articulable facts which, together with

objective and reasonable inferences, form the basis for suspecting that the particular person detain is engage in criminal activity." *United Sates v. Thompson*, 282 F.3d 673, 678 (9th Cir. 2002) (citing *United States v. Rojas-Millan*, 234 F.3d 464, 468-69 (9th Cir. 2000). An officer is entitled to rely on his training and experience in drawing inferences from the facts he observes, but those inferences must also "be grounded in objective facts and capable of rationale explanation." *United States v. Mariscal*, 285 F.3d 1127, 1130 (9th Cir. 2002) (citing *United States v. Lopez-Soto*, 205 F.3d 1101, 1105 (9th Cir. 2000); *see also Arvizu*, 534 U.S at 273 (reasonable suspicion is a process that "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'") (citation omitted).

The Fourth Amendment is satisfied if an officer's action is supported by reasonable suspicion based on the observation of facts which are by themselves consistent with innocence, but may collectively amount to reasonable suspicion. *Id*. at 273-74. As the Supreme Court has said: "The process does not deal with hard certainties, but with probabilities." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). Nevertheless, reasonable suspicion requires more than a "hunch" even if the hunch later turns out to be a good one. *Terry*, 392 U.S. at 27. Importantly, even if "the conduct justifying the stop [is] ambiguous and susceptible of an innocent explanation," *Terry* permits detention so the officers can resolve the ambiguity. *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) (citing *Terry*, 392 U.S. at 30).

Here, the totality of the circumstances justified a *Terry* stop. Just two days prior, the same detectives had seized evidence from the apartment of illegal narcotics distribution, forgery, theft of property, and a firearm that had its serial number removed. Further, the detectives had intercepted a telephone call directed toward an occupant of the apartment indicating that there might, potentially, be more evidence of criminal activity in the apartment. In that telephone call, the occupant of the apartment was specifically instructed to destroy or otherwise hide evidence in order to prevent potential prosecution. Considering the variety of evidence that had been seized regarding various potential crimes which were connected with the apartment, it was certainly reasonable to ascertain Loftin's destination and identity as he approached the apartment.

It was equally reasonable for the officers to expand their questioning as a consequence of Loftin spending several seconds altering or adjusting his right pant leg while retrieving his identification. Both detectives testified that it was this movement that primarily piqued their suspicion. Both testified that they were concerned for their own safety. They had knowledge of a potential weapon inside the apartment. They had knowledge of instructions to a resident of the apartment to destroy or hide potential evidence. And they knew that Loftin had some prior relationship with the occupants of the apartment because he said he was bringing food for the children there. Under these circumstances, it was not unreasonable to stop Loftin at the apartment door, prevent him from entering, and ask him additional questions.

There are certainly many potentially innocent reasons why Loftin would be visiting the apartment, but there were also concerns about recent, potentially illegal activities at the apartment. A *Terry* stop contemplates a limited detention to resolve such ambiguities. A valid stop can include the momentary restriction on a person's freedom of movement in order to maintain the status quo while making an initial inquiry. *United States v. Patterson*, 648 F.2d 625, 633 (9th Cir. 1981). The Supreme Court has explained that a police officer need not "simply shrug his shoulders and allow a crime to occur or a criminal to escape." *Adams v. Williams*, 407 U.S. 143, 145-47 (1972) (citations omitted). When viewed in their totality, the circumstances here justified a *Terry* stop.

### B. Frisk for Weapons

That conclusion does not end the analysis. Loftin maintains that any search, even a search under *Terry*, was not supported because there was no basis to believe that Loftin was armed and dangerous. A stop-and-frisk under *Terry* constitutes two independent actions, each requiring separate justifications. The stop must be based on a suspicion of criminal activity and the frisk on a reasonable suspicion that the person is armed. *United States v. Thomas*, 863 F.2d 622, 628 (9th Cir. 1988) ("A lawful frisk does not always flow from a justified stop. Each element, the stop and the frisk, must be analyzed separately; the reasonableness of each must be independently determined."); *see also*, *United States v. Flippin*, 924 F.2d 163, 165 (9th Cir. 1991)(same). During an investigatory detention, an officer may frisk an individual for weapons where he has reason to

11

believe that he is dealing with an armed and dangerous individual. *Terry*, 392 U.S. at 27.

The purpose of the limited search is to allow officers to conduct investigations without fear of violence. *See Adams v. Williams*, 407 U.S. 143, 146 ( 1972); *see also United States v. $109,179 in United States Currency*, 228 F.3d 1080, 1086 (9th Cir. 2000). The "narrow scope" of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked. *Ybarra v. Illinois*., 444 U.S. 85, 93-94 (1979). Nothing in *Terry* can be understood to allow a generalized "cursory search for weapons." In the companion case to *Terry*, the Court further developed the requirements for a frisk:

> The police officer is not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries. Before he places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so. In the case of the self-protective search for weapons, he must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous.

*Sibron v. New York*, 392 U.S. 40, 64 (1968). The Ninth Circuit has considered furtive movements by defendants, or repeated attempts to reach for an object that was not immediately visible, as actions that can give rise to a reasonable suspicion that a defendant is armed. *See e.g., Flippin*, 924 F.2d at 164-66 (officer alone in room with woman who grabbed a bag while he was looking away); *United States v. Taylor*, 716 F.2d 701, 709 (9th Cir. 1983) (suspect known to be involved in methamphetamine manufacturing refused to raise his hands and made furtive movements inside his truck); *see also United States v. Mitchell*, 293 U.S. App. D.C. 24, 951 F.2d 1291, 1293 (D.C. Cir. 1991) (suspect moved his hands under his coat in manner suggesting he had a gun); *United States v. Price*, 366 U.S. App. D.C. 166, 409 F.3d 436, 439 (D.C. Cir. 2005) (suspect reached back inside of car when told to place hands outside of window); *cf. Ybarra*, 444 U.S. at 93 (not finding reasonable suspicion where defendant, "whose hands were empty, gave no indication of possessing a weapon, made no gestures or other actions indicative of an intent to commit an assault, and acted generally in a manner that was not threatening.").

The central question relating to the frisk here is whether the detectives had objectively reasonable grounds to support the decision to frisk Loftin. The standard is whether a reasonably prudent person in the circumstances would be warranted in the belief that his safety or that of others was in danger. *Terry*, 392 U.S. at 27. The officer must have a subjective belief that is

objectively reasonable. *United States v. Prim*, 698 F.2d 972, 975 (9th Cir. 1983); accord *United States v. Lott*, 870 F.2d 778, 783-84 (1st Cir. 1989). Both Detectives Leaman and McMurtry testified that they became concerned for their personal safety because of the manner in which Loftin placed the grocery bags on the ground. Both testified that it took 10 seconds – much longer than they believed necessary – for Loftin to place the bags on the ground. Both noticed and were concerned that Loftin was adjusting his lower right pants as he did so. Both testified that it was difficult to see due to lighting and the items in Loftin's hands. The detectives had recovered a firearm from the apartment just two days prior, as well as other evidence of criminal activity. The detectives were present at the apartment because they intercepted instructions to the occupant of the apartment to hide, conceal, or otherwise destroy potentially incriminating evidence located in the apartment. Detective Leaman spontaneously signaled his safety concern when he said, "[s]how me your hands" to Loftin. He testified that the reason for his order was because of the suspicious nature of Loftin's actions. The firearm appeared and was seized as the result of the frisk. Based on the totality of these circumstances, the undersigned finds the police acted reasonably when they initiated the frisk of Loftin.

Having so concluded, the Court declines to consider the parties' arguments surrounding consent to search. Regardless of consent, both the stop and the frisk were justified. The firearm sought to be suppressed was recovered at the commencement of the lawful frisk, not as a result of a Constitutional violation.

**C.  Supplemental Motion for Production and Adverse Inference (# 101)**

In its Supplemental Motion for Production and Adverse Inference, Loftin makes two requests. First, he requests that emails by Detective Leaman to the AUSA which concerned the facts of this case should be produced. Based upon the government's response, this issue has now become moot because all email communications that were the subject matter of the Defendant's motion have been produced. Second, Loftin requests an adverse inference because Detective Leaman's text messages are no longer available and Loftin is thereby prejudiced.

As discussed, Loftin's motion to compel the discovery of personal cell phone records of Detective Leaman was granted by the court. (#75). The cell phone records were produced,

1  however, the cell provider responded that the actual content of texts is not stored unless the
2  customer subscribes to a certain service, and in this case, Detective Leaman did not subscribe to
3  that service for his cell phone.  If the texts were stored on Detective Leaman's old cell phone, the
4  government has indicated that they were lost when he upgraded to a new cell phone.  Loftin moves
5  for an adverse inference that "the missing text messages were relevant to this case and that they
6  were favorable to Loftin."   The government responds that it is not clear the texts were ever in the
7  custody and control of the government, were exculpatory or had anything to do with the present
8  case because the contents were unknown, and they were not lost as the result of the government's
9  bad faith.

10  Due process requires that criminal prosecutions "comport with prevailing notions of
11  fundamental fairness." *California v. Trombetta*, 467 U.S. 479, 485 (1984).  The Government must
12  afford criminal defendants "a meaningful opportunity to present a complete defense," which means
13  it must provide an accused with exculpatory evidence. *Id.*  There is a duty to preserve evidence
14  "that might be expected to play a significant role in the suspect's defense." *Id*. at 488.  To meet this
15  standard of constitutional materiality, the evidence "must both possess an exculpatory value that
16  was apparent before the evidence was destroyed, and be of such a nature that the defendant would
17  be unable to obtain comparable evidence by other reasonably available means." *Id.* at 489.  The
18  "mere possibility" that the lost or destroyed evidence is exculpatory does not meet the materiality
19  standard. *United States v. Agurs*, 427 U.S. 97, 109 (1976).  The evidence is material only if there is
20  a reasonable probability that, had the evidence been disclosed to the defense, the result of the
21  proceeding would have been different.  A "reasonable probability" is a probability sufficient to
22  undermine confidence in the outcome. *United States v. Bagley*, 473 U.S. 667, 682 (1985).
23  Moreover, the Court held in *Arizona v. Youngblood*, 488 U.S. 51 (1988), that unless a criminal
24  defendant can show bad faith on the part of the police, failure to preserve potentially useful
25  evidence does not constitute a denial of due process of law. *See also, Featherstone v. Estelle*, 948
26  F.2d 1497, 1504 (9th Cir. 1991) (destruction of photo lineup not a denial of due process because it
27  was not exculpatory and not prejudicial).
28  Loftin argues that the texts might reveal that Detective Leaman knew Loftin before he

arrived at the scene, but he does not explain what difference that would make as to the facts or analysis of the search.[7] Loftin does not argue that the texts are exculpatory. *See Agurs, at 109* (even a "mere possibility" that the lost evidence is exculpatory does not meet the materiality standard.) The Court is not persuaded that the lost texts play a "significant role" in Loftin's defense, and so there was no duty to preserve the texts. *Trombetta*, 467 U.S. at 488.

Moreover, Loftin still has available the comparable impeachment evidence that Detective Leaman said he arrived at the apartments at about 10 p.m., and the records indicate he contacted Dispatch at 9:43 p.m. Loftin argues that if he had Detective Leaman's texts, he would have likely been able to more effectively cross-examine Detective Leaman concerning the series of events that took place. There is no evidence or theory proffered by the defense that the missing texts had anything to do with Loftin, or how they would have impacted the facts of the search. There is not a "reasonable probability" that the presentation of these missing texts would undermine the outcome of this case.

Finally, even if the lost texts are assumed to be exculpatory, there is no evidence that their destruction was in bad faith. The cell phone record provider indicated that it never had the texts, and it appears that Detective Leaman does not have them because he upgraded his phone and discarded the telephone on which the texts might have been stored. There is no basis for a finding of "bad faith," and in the absence of bad faith, failure to preserve the texts is not a denial of due process. *See Youngblood,* 488 U.S. at 58.

Loftin argues that, even if the destruction of the texts does not rise to the level of a constitutional violation, the court may still impose sanctions, citing *United States v. Loud Hawk*, 628 F.2d 1139, 1152 (9th Cir. 1979)(Kennedy J., concurring), *overruled on other grounds by U.S. v. W.R. Grace*, 526 F.3d 499 (9th Cir. 2008). He argues that the proper balance is that between the quality of the Government's conduct and the degree of prejudice to the accused, and that the Government bears the burden of justifying its conduct and the defendant bears the burden of

---

[7] Because the Court previously issued a Report and Recommendation regarding the suppression motion, (#44) to which Loftin had objected, defense counsel was well aware of the undersigned's analysis of the evidence.

demonstrating prejudice.  Loftin therefore asks for an adverse inference that the missing text messages were "relevant to this case and that they were favorable to Loftin."  As previously discussed, Loftin fails to articulate how the missing text messages might be relevant to the case, or how they would be favorable.  He has articulated only speculative relevance and no prejudice that results from the loss of the texts.  The government has explained that the texts were never in its custody[8] or never aware that they existed or should be preserved.  It further states that loss of the texts was not the result of a failure to follow policy or procedure regarding the preservation of evidence, but rather simply a phone upgrade by Detective Leaman.   The Court agrees.  Consequently, under these circumstances, no sanctions are appropriate.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence for Fourth Amendment Violation (#26) be **denied**.

## NOTICE

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days.  The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time.  *Thomas v. Arn*, 474 U.S. 140, 142 (1985).  This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court.  *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED: January 22, 2015.

_____
**C.W. Hoffman, Jr.
United States Magistrate Judge**

---

[8] The court previously ruled, as noted by the defense, that the government did not possess or control the texts.  *See* Defense Supp Motion #101, at fn 1.